AO 106 (Rev. 04/10) Application for a Search Warrant                                    AUTHORIZED AND APPROVED/DATE: s/Mary E. Walters 4/22/2024

# UNITED STATES DISTRICT COURT
### for the
Western District of Oklahoma

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>3005 SW 60th Street, Oklahoma City, Oklahoma | )<br>)<br>)   Case No.  M-24-360-STE<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Western _____ District of _____ Oklahoma _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 846 and 841(a) | Drug Conspiracy |
| 18 U.S.C. § 1956 and/or 1957 | Laundering of Monetary Instruments |

The application is based on these facts:
See attached Affidavit of TFO Anthony Finnegan, DEA

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

TFO Anthony Finnegan, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   **Apr 22, 2024**

_____
*Judge's signature*

City and state:  Oklahoma City, Oklahoma

Shon T. Erwin, United States Magistrate Judge
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

**In the Matter of the Search of**
**3005 SW 60th Street**
**Oklahoma City, Oklahoma**

Case No. _____

**FILED UNDER SEAL**

### Affidavit in Support of an Application
### Under Rule 41 for a Warrant to Search and Seize

I, Task Force Officer Anthony Finnegan, being first duly sworn under oath, depose and state:

### Introduction and Agent Background

1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search **3005 SW 60th Street Oklahoma City, Oklahoma**, Western District of Oklahoma, including outbuildings and vehicles on the curtilage premises as further described in Attachment A, for the things described in Attachment B.

2.    I am presently assigned as a Task Force Officer (TFO) with the DEA Tulsa Resident Office (TRO) and have been since April 2019. I am also a police officer for the Tulsa Police Department and have been so for approximately fifteen years. I have a Bachelor of Science in Business Administration-Management from the University of Tulsa. During my time as a Narcotics Investigator with the Tulsa Police Department and as a TFO with the DEA, I have participated in wire and physical surveillance, surveillance of undercover transactions, the introduction of

undercover agents, the execution of search warrants, debriefings of informants, and reviews of taped conversations and drug records. During my time as a TFO with the DEA, I have participated in complex international conspiracy investigations involving organizations responsible for the unlawful manufacturing, importation, transportation, and distribution of drugs. I have also investigated corruption and violent criminal offenses related to the activity of DTOs. I have been involved in drug trafficking investigations of an international, national, and regional scope.

3.    I have completed the Clandestine Laboratory Basic Safety Certification and Clandestine Laboratory Site Safety Officer courses. I am certified in the recognition of the methods of manufacturing methamphetamine and am also certified to dismantle clandestine laboratories. During this training, your affiant was certified to recognize the chemicals and equipment needed for the illegal manufacture of methamphetamine. I am knowledgeable about state and federal drug laws. I have completed the Drug Enforcement Administration Basic Narcotics Investigator School. I have attended the Drug Enforcement Administration Task Force Officer School. I have received formal training in narcotics investigations from the Tulsa Police Academy, as well as informal training received from more experienced officers. I have completed the Indoor Marijuana Grow Investigations School. I have attended the Reid Technique of Interviewing and Interrogation School. I have attended the Operation Jetway Interdiction Course. I have authored both state and federal search warrants and have participated in Title III investigations. I have

2

purchased narcotics in an undercover capacity and participated in controlled deliveries of narcotics. I have interviewed numerous individuals involved in the use, sales, manufacturing, and transportation of illegal narcotics. I have learned of the distribution schemes utilized by individuals involved in drug trafficking organizations. During the course of my training and experience with various defendants, I have learned how individuals involved in drug distribution schemes maintain records and conspire to deceive law enforcement as well as rival distributors of controlled dangerous substances. Through this training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed and the methods of payment for such drugs. I have participated in numerous complex conspiracy cases prosecuted within the federal justice system. I have trained other narcotics detectives within the Tulsa Police Department's Special Investigations Division.

4.    As a result of my personal participation in the investigation of matters referred to in this affidavit and based upon reports made to me by other law enforcement agencies and witnesses, I am familiar with the facts and circumstances of this investigation. The property to be searched is described in Attachment **"A."** Attachment **"B"** is a list of items for which authority is sought to search and seize. Since this affidavit is presented to support an application for a search warrant of the premises described on Attachment "A," I have not included each and every fact I know concerning this investigation. However, I have set forth the facts that I believe

3

are essential to establish the necessary foundation and probable cause to support the Application for Search Warrant and Search Warrant for the property to be searched described in Attachment "A."

5.    Based on my training, experience, and the facts set forth in this affidavit, there is probable cause to believe that evidence of violations of Title 21, United States Code, Section 846 and 841(a) – Drug Conspiracy and Title 18, United States Code, Sections 1956 and/or 1957 –Laundering of Monetary Instruments will be located at **3005 SW 60th Street Oklahoma City, Oklahoma**, Western District of Oklahoma including outbuildings and vehicles on the curtilage premises as further described in Attachment A.

### Jurisdiction

6.    "[A] warrant may be issued to search for and seize any property that constitutes evidence of a criminal offense in violation of the laws of the United States." 18 U.S.C. § 3103a.

7.    The requested search is related to the following violations of federal law:

    a.  21 U.S.C. §§ 846 and 841(a) – Conspiracy to Distribute and to Possess with Intent to Distribute Controlled Substances, and

    b.  18 U.S.C. §§ 1956 and/or 1957 – Laundering of Monetary Instruments

8.    Venue is proper because the person or property described in this affidavit is located within the Western District of Oklahoma. Fed. R. Crim. P. 41(b)(1).

### Drug Offenses Background

9.    I have had extensive experience in debriefing defendants, co-conspirators,

witnesses, and informants who have been involved in unlawful drug trafficking and

who have had personal experience involving the techniques and methods by which

drug traffickers maintain records to identify and locate other drug conspirators, the

amounts of drugs distributed and to whom the drugs are distributed, the moneys

owed and paid for drugs, as well as the techniques and methods by which drug

traffickers acquire, spend, convert, transport, distribute, and conceal the proceeds

they derive from unlawful drug trafficking.

10.    My participation in drug trafficking investigations has resulted in both the

successful prosecution of numerous individuals and the forfeiture to the United

States Government of assets purchased with the proceeds from unlawful drug

trafficking, as well as assets used to facilitate said violations. In connection with drug

trafficking investigations, I have participated in and/or executed several search and

seizure warrants at residences, stash houses used as storage and distribution points

for controlled substances, and other locations.

11.    Materials searched for and recovered in those locations have included

various controlled substances, including cocaine, methamphetamine, and marijuana;

drug paraphernalia such as scales, papers and drug packaging materials; books and

records reflecting sales, the transfer or transportation of drugs and amounts of money

owed for drugs; records reflecting the names, addresses, and telephone numbers of

5

co-conspirators; sales receipts and other records reflecting the expenditure of moneys that are the proceeds from unlawful drug distribution; currency and money wrappers; computers and computer discs containing drug ledgers and records, and various valuable assets (i.e., automobiles) purchased with the proceeds of unlawful drug trafficking.

12.    Based on my background, training, and experience, as previously detailed in this affidavit, I know:

a.    Drug traffickers often place assets in names other than their own to avoid detection of these assets by law enforcement. In addition, drug traffickers often use rental vehicles to prevent detection and identification by law enforcement and to prevent forfeiture of the vehicles;

b.    Even though these assets are in the names of other people, the drug traffickers continue to use these assets and exercise dominion and control over them;

c.    Drug traffickers must maintain a large amount of U.S. currency in order to finance their ongoing narcotic activities;

d.    Drug traffickers maintain books, computer data and programs, records, receipts, notes, ledgers, airline tickets, money orders, cashier's checks, records of wire transfers, records of purchase of vehicles and property and other papers relating to the importation, ordering, sale, transportation, possession, purchase, and transfer of controlled substances;

6

e. Drug traffickers keep records that are usually recorded in units of weight and monetary value, associated with pounds and kilograms or other such units of measurement and dollar amounts to assist them in their business, records to keep track of amounts "fronted" to customers and money owed by customers for amounts "fronted" by the trafficker; the aforementioned records, books, notes, ledgers, etc., are maintained where drug traffickers have ready access to them, i.e., on their persons, in their vehicles, or in or about their residences or place of business, these documents are often kept in code to secret their meaning from law enforcement;

f. It is common for drug traffickers to secrete contraband, proceeds of drug sales, financial instruments, precious metals, jewelry, and other items of value, and/or proceeds of drug transactions, records or evidence of drug transactions relating to transferring, secreting, or spending of large sums of money made from engaging in narcotic trafficking in secure locations on their persons, within their vehicles, or within or around their residences or businesses for ready access or to conceal them from law enforcement authorities;

g. When drug traffickers amass proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits. To accomplish these goals, drug traffickers utilize some, if not all, of the following means; foreign and domestic

7

banks and their attendant services, securities, cashier's checks, money orders, bank drafts, letters of credit, real estate, shell corporations, and business frauds;

h.      Drug traffickers commonly maintain names, addresses, or telephone numbers in books or papers for their associates in the trafficking organization; these books or papers include such items as address books, telephone messages, in and correspondence, etc. Shorthand and/or code names are sometimes used for buyers, co- conspirators, sellers, weights, and other details of the drug traffickers;

i.      Drug traffickers secrete and maintain in their residences, storage buildings, barns and outbuildings, places of business, family member's residences, and the residences of co-conspirators, financial records which, when analyzed, will show their accumulation and expenditure of money and assets substantially exceeds any legitimate income. I am aware that the courts have recognized that unexplained wealth is probative of crimes motivated by greed, in particular, trafficking in drugs;

j.      The books, records, receipts, notes, ledgers, and other items mentioned above, are commonly maintained where the drug traffickers have ready access to them and are maintained often long periods of time after the actual event reflected in the documents.

k.      Drug traffickers take or cause to be taken photographs of themselves, their associates, their property, and their product. These traffickers usually maintain these photographs in their possession;

8

l.    Drug traffickers usually keep paraphernalia for packaging, cutting, weighing, and distributing narcotics; and these paraphernalia include but are not limited to scales, plastic bags, cutting agents, and other devices used for packaging to aid in the concealment of the drug for its distribution;

m.    That drug traffickers usually keep paraphernalia, equipment, and supplies for cultivating, and distribution of the marijuana, and that these items include, but are not limited to, scales, plastic bags, cutting implements, growing pots, insecticides, fertilizers, and other growing supplies.

n.    The courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, including trafficking in controlled substances;

o.    Dealers in narcotics often keep handguns, ammunition, and other weapons in their residences (including outbuildings), businesses, and automobiles to safeguard supplies of drugs and the fruits of narcotics dealings;

p.    Drug traffickers often operate under assumed names in order to conceal their true identities from law enforcement officers and, in so doing, acquire property, services, and personal identification (such as driver's licenses and birth certificates) under their assumed or alias names and that they maintain such documents in evidence of their false identities in their residences (including outbuildings), businesses, and automobiles together with evidence of their true identities;

9

q.     Drug traffickers commonly conduct a significant amount of their business by using telephone systems and normally make frequent calls to conduct, direct, supervise, and coordinate their activities;

r.     Drug traffickers commonly keep their stash of controlled substances and currency proceeds separate and store the same in multiple residences (including outbuildings), businesses and automobiles.

## Probable Cause

13.   The DEA, the Federal Bureau of Investigations (FBI) and the Tulsa Police Department (TPD) Special Investigations Division (TPD/SID) are investigating Domingo Saucedo who is believed to be the head of the Saucedo drug trafficking organization (the "Saucedo DTO" or "DTO"), for arranging the importation of large shipments of methamphetamine and cocaine from Mexico into the United States. The Saucedo DTO consists of several associates of Saucedo and others, both known and unknown to include Gabriel Urquiza-Urquiza, a/k/a "Gabriel Urquiza-Urquiza." Saucedo lives in Mexico. Some of his known associates such as Gabriel Urquiza are based in the Tulsa, Oklahoma area. Based on previous investigations conducted by DEA, TPD and FBI, investigators know that Saucedo and his associates have been smuggling illegal drugs into the United States for years and are presently capable of importing numerous kilograms of methamphetamine and cocaine on a single occasion.

10

14.  In October 2022, the FBI initiated an investigation into a drug trafficking organization involved in the distribution of large quantities of methamphetamine in the Tulsa, Oklahoma-based area. During this investigation, the FBI identified Saucedo to be a source of supply for illegal narcotics and that he used telephone number 52-732-103-1127. During the FBI investigation, Saucedo directed money laundering of drug proceeds to take place at 12624 East 19th Street, Tulsa, Oklahoma (Gabriel Urquiza-Urquiza's house).

15.  In July 2023, TRO began investigating the Saucedo DTO, including a member responsible for laundering drug proceeds via large bulk currency pickups throughout the United States. Based on his training, experience and knowledge of this investigation, Affiant knows that large-scale drug trafficking organizations, such as the Saucedo DTO, involved in the distribution of large quantities of illegal narcotics often utilize more sophisticated money laundering schemes to move drug proceeds back to the drug trafficking organization in Mexico. The method of utilizing United States banks begins when a member of the organization has obtained a certain quantity of United States currency (USC) that needs to be moved as it is derived from the sales of illegal narcotics by the organization. A broker is then responsible for arranging the exchange from the individual who is in possession of the USC to another individual who is responsible for getting the USC deposited into a bank account in the United States. Ultimately, these drug proceeds are then transferred from the account in which they were deposited to an account that belongs

11

to the organization. Based on my training and experience, and knowledge of this investigation, I know that after the transfer of USC into the organization's account, the money is withdrawn and/or transferred into other account(s) in Mexico belonging to the organization.

16.  During this investigation, a United States District Judge in the Northern District of Oklahoma, signed affidavits and orders authorizing investigators to intercept communications over telephone number 918-948-0749 (Target Telephone #1) and telephone number 918-200-8532 (Target Telephone #2). These interceptions lasted from January 31, 2024 until April 8, 2024. Both of these numbers were used by Gabriel Urquiza-Urquiza.

17.  During the course of interceptions over Target Telephones #1 and #2, investigators have confirmed Hispanic males using telephone number 737-357-5180 (UM5180) and telephone number 619-369-96761 (UM6167) to be facilitators who organize the movement of drug proceeds and the distribution of large quantities of methamphetamine for the DTO.

**Money Deliveries to a Confidential Source**

18.   During this investigation, a Confidential Source (CS)[1] was utilized to make two controlled pickups of USC from Gabriel Urquiza-Urquiza. On July 13, 2023, the CS, at the DEA's direction, met up with Gabriel Urquiza-Urquiza and obtained $80,000. An undercover DEA agent later deposited the money into a bank account. On August 2, 2023, the CS, at the DEA's direction, again met up with Gabriel Urquiza-Urquiza and obtained $60,005. The Undercover DEA agent deposited the money into a bank account.

19.   During the second money delivery, the CS asked to obtain methamphetamine from Urquiza-Urquiza, who replied that he did not want to "step on anyone's toes" and would think about it.

---

[1] CS-1 has been cooperating with members of the TRO for approximately one year. CS-1 is cooperating for the purpose of prosecutorial consideration. No other form of consideration has been offered to CS-1. While working as a confidential source, CS-1 has provided information on three or more occasions that has proven to be reliable. CS-1 is familiar with various drug distribution methods employed by drug trafficking organizations. Additionally, CS-1 is familiar with the different methods of money laundering employed by drug trafficking organizations. The information provided by CS-1 has been corroborated by independent evidence, including surveillance, toll records, court ordered intercepted communications, and the seizure of narcotics. CS-1 has a prior criminal history for possession of controlled substances with intent to distribute and possession of firearm. I believe CS-1 is a reliable and credible confidential source. The information provided by CS-1 to date is reliable.

## Money Deliveries Intercepted Over Wiretaps

**February 13, 2024**

*A. Calls arranging money delivery*

20.   On February 13, 2024, investigators intercepted an audio call about the delivery of drug proceeds between Gabriel Urquiza-Urquiza, and UM6761 and between Urquiza-Urquiza and UM5180. During these calls, Urquiza-Urquiza and UM6761 coordinated a money delivery from a money courier to Urquiza-Urquiza at the El Chico restaurant in Tulsa.

21.   Investigators then intercepted an audio call between Urquiza-Urquiza and UM5180, while Urquiza-Urquiza was on the way to meet this courier. UM5180 directed Urquiza-Urquiza to deliver $25,000 U.S. Currency to a female in a gray car and said that the female was on her way to Tulsa to meet with Urquiza-Urquiza. Additionally, UM5180 told Urquiza-Urquiza to save $6,000. Investigators believe Urquiza-Urquiza was to obtain a total of $31,000 U.S. Currency from a female driving a gray car on behalf of UM6761. UM5180 informed Urquiza-Urquiza that "Oso" owes him (UM5180) $100,000 for 26 kilos of methamphetamine and that it has been three weeks and UM5180's boss wants his money. UM5180 said he (UM5180) had sent another 25 kilograms of methamphetamine and the money Urquiza-Urquiza was picking up today was proceeds from those 25 kilograms.

22.   At approximately 12:10 p.m., members of the TRO established physical surveillance in the area of 7100 South Mingo Road Tulsa, Oklahoma. At

approximately 12:12 p.m., GPS location data indicated the Jeep Commander arrived and parked in the northeast parking lot of 7100 South and Mingo Road Tulsa, Oklahoma near the Golden Corral restaurant.

23.   At approximately 12:16 p.m., investigators intercepted an outgoing audio call from Urquiza-Urquiza, utilizing Target Telephone #1, to UM6761 at telephone number 619-369-6761 (Session #49). During this call, Urquiza-Urquiza told UM6761 that he (Urquiza-Urquiza) did not see the girl.

24.   At approximately 12:17 p.m., investigators intercepted an outgoing audio call from Urquiza-Urquiza, utilizing Target Telephone #1, to UM6761 at telephone number 619-369-6761 (Session #50, call in progress from Session #49). During this call, Urquiza-Urquiza said he (Urquiza-Urquiza) was there but could not see her (the third-party). UM6761 said she (the third-party) was on 71st turning to go to the restaurant and should be arriving soon. UM6761 asked where he (Urquiza-Urquiza) was parked. Urquiza-Urquiza said [UNINTELLIGIBLE]. UM6761 told Urquiza-Urquiza he (UM6761) would let her know that Urquiza-Urquiza was beside Golden Corral.

*B. Arrival of Leticia GARCIA-Salazar in the gray Chevrolet Malibu*

25.   At approximately 12:23 p.m., a gray Chevrolet Malibu, bearing Oklahoma tag NVE512, arrived and parked near the Jeep Commander. A registration check of Oklahoma tag NVE512 revealed the tag is registered to a gray 2018 Chevrolet

15

Malibu to Leticia Garcia-Salazar at **3005 SW 60th Street, Oklahoma City, Oklahoma**.

26. At approximately 12:25 p.m., investigators observed a Hispanic male, matching the description of Gabriel Urquiza-Urquiza, wearing a dark colored baseball hat, black hooded sweatshirt and blue jeans exit the driver's door of the Jeep Commander and walk to the gray Chevrolet Malibu. Urquiza-Urquiza opened the front passenger's door to the Malibu and leaned into the vehicle. At approximately 12:26 p.m., Urquiza-Urquiza shut the front passenger's door to the Malibu, holding a white plastic bag. Urquiza-Urquiza walked back to the white Jeep Commander and entered the driver's seat. At same time, both vehicles depart the location.

27. Members of the TRO maintained physical surveillance of the gray Chevrolet Malibu as it departed the location while I monitored the GPS location data for the white Jeep Commander.

28. At approximately 12:32 p.m., the GPS location data indicated the white Jeep Commander arrived and parked at the QuikTrip, located at 9529 East 51st Street Tulsa, Oklahoma. At approximately 12:34 p.m., the Chevrolet Malibu arrived and parked at the Chardonnay Apartment complex, located at 7215 South 92nd East Avenue and parked near Apartment 2. A short time later, investigators established physical surveillance of 7215 South 92nd East Avenue, Apartment 2 and observed a Hispanic female, wearing a brown hoodie, standing at the Chevrolet Malibu. The Hispanic female then walked to and entered Apartment 2 a short time later.

16

**March 8, 2024**

    *A. Intercepted Calls Arranging a Money Delivery to Urquiza*

    29.  On March 8th, 2024, at approximately 6:17 p.m., investigators intercepted an incoming audio call from an unidentified Hispanic male (UM6761), using telephone number 609-269-4130, to Urquiza-Urquiza, on Target Telephone #1 (Session #228). During this call, UM6761 asked Urquiza-Urquiza if he could meet at El-Chico's (a restaurant). Urquiza-Urquiza old UM6761 it would have to be around 7:00. Urquiza-Urquiza then asked UM6761 if it was the one on 71st. UM6761 says yes.

    30.  At approximately 6:41 p.m., GPS location data for Urquiza-Urquiza's white Jeep Commander bearing Oklahoma tag IND910, indicated the Jeep departed from 1548 North Pittsburgh, Tulsa, Oklahoma. At approximately 6:45 p.m., TFO Foster established physical surveillance in the area of El-Chico Parking lot at 9705 East 71st Street, Tulsa, Oklahoma. At approximately 6:59 p.m., GPS location data indicated the Jeep Commander arrived and parked in the east parking lot between El-Chico and Panda Express. TFO Foster observed the white Jeep Commander park and watched it until the exchange was done.

    31.  At Approximately 7:04 p.m., investigators intercepted an incoming audio call from UM6761, using telephone number 609-269-4130, to Urquiza-Urquiza, at Target Telephone #1 (Session #232). During this call, URQUIZA asked if the courier was nearby and if it was going to be the girl. UM6761 said yes and asked if

17

Urquiza-Urquiza was there already. Urquiza-Urquiza said yes. UM6761 asked if

Urquiza-Urquiza was in the Jeep or in the truck. Urquiza-Urquiza said he was in the

Jeep parked in the same spot as last time. UM6761 said okay, they would be there in

5 minutes. Urquiza-Urquiza said okay.

32.   At Approximately 7:19 p.m., investigators intercepted an outgoing audio call

from Urquiza-Urquiza, on Target Telephone #1, to UM6761, on telephone number

609-269-4130 (Session 233). During this call, URQUIZA said they (the girl) had not

arrived yet. UM6761 said he would call them.

*B.  Money delivery by Garcia-Salazar*

33.   At approximately 7:21 p.m., TFO Foster observed a gray Chevrolet Malibu

bearing Oklahoma tag NVE512, arrive and back in beside Urquiza-Urquiza's Jeep

Commander. This vehicle was also being monitored by GPS location data and

belongs to Leticia Garcia-Salazar at **3005 SW 60th Street Oklahoma City,**

**Oklahoma**.

34.   At approximately 7:21 p.m., TFO Foster observed a Hispanic male,

matching the description of Gabriel Urquiza-Urquiza, wearing a dark colored

baseball hat, black hooded sweatshirt, blue jeans, and white tennis shoes exit the

driver's door of the Jeep Commander and walk to Garcia-Salazar's gray Chevrolet

Malibu. TFO Foster lost sight of Urquiza-Urquiza for about 8 to 9 seconds, then

TFO Foster observed Urquiza-Urquiza walk around to the front of the vehicle and

return to the driver's seat of his Jeep Commander.

35.  At approximately 7:22 p.m., TFO Foster observed Urquiza-Urquiza return to his vehicle, enter into the driver's seat, and depart from the area. At the same time, TFO Foster observed the gray Chevrolet Malibu bearing Oklahoma tag NVE512 leave the parking spot and drive towards the west.

36.  At approximately 7:31 p.m., the GPS location data indicated the white Jeep Commander arrived and parked at El Patron Cocina Mexicana, located at 11101 East 41st Street Tulsa, Oklahoma. TFO Foster observed GPS location data on the Jeep Commander to indicate the vehicle was in the parking lot for approximately two minutes before leaving.

37.  At approximately 7:37 p.m., the GPS location data indicated the white Jeep Commander arrived at the Alexis Apartments at 12515 East 41st Street Tulsa, Oklahoma. The Jeep Commander travelled to the back of the complex near apartment number #616. TFO Foster observed GPS location data to indicate the Jeep Commander was in this area of the Alexis Apartments parking lot for approximately two minutes.

38.  At approximately 7:44 p.m., the GPS location data indicated the white Jeep Commander arrived and parked at the Bakery Panaderia Misol, located at 3114 South 108th East Avenue Tulsa, Oklahoma. The Jeep Commander departed the

19

Bakery at approximately 7:51 p.m. Investigators believe this bakery contains a

money remitting service. Urquiza-Urquiza has been to this bakery in the past.[2]

**Seizure of 32 Kilograms of Methamphetamine**

39.    On March 12, 2024, at approximately 2:04 p.m., members of the TRO

observed via electronic surveillance, a female matching the description of Leticia

Garcia-Salazar exit the front entry door to 7215 South 92nd East Avenue, Apartment

2 Tulsa, Oklahoma with a large gray plastic tote. Garcia-Salazar had to physically

drag the tote through the front door of the apartment. Leticia Garcia-Salazar dragged

and then pushed the gray tote to the parking lot and the rear of the gray 2018,

Chevrolet Malibu, bearing Oklahoma tag NVE512. Garcia-Salazar placed the tote in

the trunk of the Chevrolet Malibu and closed the trunk lid.

40.    At approximately 2:06 p.m., GPS location data for the tracking device

installed on the Chevrolet Malibu indicated the Chevrolet Malibu departed the

location. I monitored the GPS location data for the Chevrolet Malibu once it

departed. At approximately 2:13 p.m., GPS location data indicated the Chevrolet

Malibu, driven by Garcia-Salazar arrived in the parking lot east of the Abuelo's

Mexican Restaurant, located at 10909 East 71st Street Tulsa, Oklahoma. A short

time later, investigators established physical surveillance of the Chevrolet Malibu and

---

[2] Urquiza-Urquiza has frequented this particular location multiple times and investigators believe this is a location where he wires money from to Mexico on behalf of UM5180. On March 8, 2204 (Session # 230), Urquiza-Urquiza talked about an account number and sending money to Mexico.

observed it parked next to an orange Dodge Challenger, bearing Oklahoma tag KXL725. I observed a Hispanic male, wearing a white t-shirt and red pants at the trunk of the Chevrolet Malibu. The trunk of the Chevrolet Malibu was open and the Hispanic male removed the aforementioned gray tote from the trunk of the Malibu and carried it to the back of the orange Dodge Challenger. At the same time, the Chevrolet Malibu departed the location. Surveillance of the Chevrolet Malibu was terminated at that time.

41.   I observed the Hispanic male place the gray tote in the trunk of the orange Challenger. A registration check of Oklahoma tag KXL725 revealed the tag to be registered to an orange 2011 Dodge Challenger to Erika Romero at 1501 NW 8th Street, Oklahoma City, Oklahoma.

42.   At approximately 2:18 p.m., I observed the orange Challenger depart the Abuelo's parking lot and travel to the Texas Roadhouse parking lot, just east of the Abuelo's. The Hispanic male exited the driver's seat and walked up to and pulled on the doors to the Texas Roadhouse that appeared to be locked. The Hispanic male then entered back into the orange Challenger and traveled east through the parking lot and stopped at the east end of the shopping center parking lot for approximately one minute. At approximately 2:21 p.m., I observed the orange Challenger travel west through the parking lot and then westbound on 71st street. The orange Challenger failed to signal a lane change on 71st street east of Highway 169. The orange Challenger then traveled southbound on Highway 169.

43. At approximately 2:28 p.m., Tulsa Police Department (TPD) Uniform Officers William Badgett, Ronni Lowman, and Joel Burks conducted a probable cause traffic stop on the orange Challenger at approximately 9200 South Highway 169 southbound Tulsa, Oklahoma. Upon initial contact with the orange Challenger, TPD Officers identified the orange Challenger to be occupied by the Hispanic male driver, wearing the white shirt and red pants and a Hispanic female passenger. The Hispanic male was later identified as Elieser Blanco, and the female passenger identified as Adomaris Jimenez. The TPD Officers confirmed that neither of the occupants of the orange Challenger had a valid driver's license to operate a motor vehicle.

44. The TPD Officers William Badgett, Ronni Lowman and Joel Burks had both occupants exit the orange Challenger, at which time, Blanco was arrested for driving without a driver's license. TFO Mike Helton, Acting Group Supervisor (A/GS) Taylor Wilson, and I responded to the scene of the traffic stop and conducted a search of the orange Challenger. We located the large gray tote in the trunk. Inside the gray tote were multiple large clear plastic Ziploc baggies that contained a crystal substance, suspected methamphetamine.

45. A/GS Wilson and I took possession of the large gray tote containing the suspected methamphetamine and transported it to the TRO for processing and safekeeping. TFO Mike Helton conducted a field test of a sample of the crystal substance, which tested presumptive positive for methamphetamine. The gross

weight of the Ziploc baggies containing the suspected methamphetamine was 32,604.2 grams (approximately 32 kilograms).

**March 28, 2024**

*Garcia-Slazar's car observed at **3005 SW 60th St. Oklahoma City, Oklahoma***

46.    On March 28, 2024, at approximately 05:30 a.m., members of the TRO along with Oklahoma City District Office (OCDO) conducted physical surveillance at **3005 SW 60th Street Oklahoma City, Oklahoma**. While conducting surveillance, investigators observed the gray 2018 Chevrolet Malibu, bearing Oklahoma tag NVE512, parked in the driveway of the residence. During this investigation, investigators have identified the gray Chevrolet Malibu to have been previously driven by Leticia Garcia-Salazar.

47.    Additionally, investigators observed the black Chevrolet Impala bearing paper tag UD5695 003693, currently driven by Leticia Garcia-Salazar, parked in the street in front of **3005 SW 60th St. Oklahoma City, Oklahoma**.

**April 3, 2024 – Money Delivery to Urquiza-Urquiza by Garcia-Salazar**

*A. Intercepted calls arranging a money delivery*

48.    On April 3, 2024, at approximately 8:58 p.m., Urquiza-Urquiza, on Target Telephone #1), received a call from UM6761 at telephone number 470-861-8465 (Session #440). During this call, UM6761 asked Urquiza-Urquiza to meet a courier on 71st by the freeway, by Target in front of Canes.

49.   Following the call described above, A/GS Taylor Wilson and TFO Tim Wilson established surveillance at Raising Canes, located at 10707 East 71st Street, Tulsa, Oklahoma. Meanwhile, TFO Tony Finnegan conducted electronic surveillance at Urquiza-Urquiza's residence, located at 12624 East 19th Street, Tulsa, Oklahoma. At approximately 8:54 p.m., I observed a dark colored small sedan depart from Urquiza-Urquiza's residence.

*B. Meeting between Urquiza-Urquiza and Gacia-Salazar*

50.   At approximately 9:40 p.m., A/GS Wilson observed a black 2009 Honda Accord 2-door bearing Oklahoma tag PJT532 parked in front of Target. A registration check of Oklahoma tag PJT532 revealed the tag is registered to a black 2009 Honda Accord to Roberto Carlos Urquiza-Urquiza at 12533 East 41st Street, Tulsa, Oklahoma. Investigators know that this vehicle belongs to Urquiza-Urquiza's brother and that he began using it after law enforcement stopped him driving a Chevrolet Traverse on March 30, 2024 (see below). I believe he was avoiding driving his normal vehicles.

51.   At approximately 9:41 p.m., A/GS Wilson observed Leticia Garcia-Salazar's black Chevrolet Impala bearing paper tag UD5695003693 arrive to the Target parking lot. GPS location data on Garcia-Salazar's vehicle indicated she drove to the area of the Target parking lot near Raising Canes.

52.   At approximately 9:42 p.m., Urquiza-Urquiza, on Target Telephone #1, received a call from UM6761, on telephone number 470-861-8465 (Session #445).

During this call, UM6761 told Urquiza-Urquiza that the girl had just arrived and she was not able to see Urquiza-Urquiza. Urquiza-Urquiza asked if she as at Canes. UM6761 said yes. Urquiza-Urquiza said he was beside there and was in a black car. UM6761 said that she was also in a black car. Urquiza-Urquiza said okay and that he would keep a lookout.

53.  Following the call described above, TFO Wilson observed Urquiza-Urquiza's black Honda sedan briefly park next to GARCIA-Salazar's black Chevrolet Impala. At approximately 9:44 p.m., both vehicles departed from the parking lot in separate directions. Upon Urquiza-Urquiza's departure from the parking lot, investigators terminated surveillance on him.

54.  At approximately 9:48 p.m., TFO Darin Zumwalt observed Garcia-Salazar arrive at his residence, located at 7215 South 92nd East Avenue, Apartment #2, Tulsa, Oklahoma.

*C. UM5180 called to follow up*

55.  At approximately 9:49 p.m., Urquiza-Urquiza, on Target Telephone #1, called UM5180, at telephone 737-357-5180 (Session #446). During this call, UM5180 asked if Urquiza-Urquiza saw the guy. Urquiza-Urquiza said yes, and told him (UM5180) that he (Urquiza-Urquiza) received "10," but he (Urquiza-Urquiza) was going to check and let UM5180 know tomorrow. UM5180 said all right then. Urquiza-Urquiza said he would call UM5180 tomorrow.

25

56. Based on my training and experience, and knowledge of this investigation, I believe Urquiza-Urquiza told UM5180 that he (Urquiza-Urquiza) met and received drug proceeds from a money courier. Urquiza-Urquiza believed he had received $10,000 in drug proceeds but was going to count the cash and confirm the amount with UM5180 tomorrow.

*D. Leticia GARCIA-Salazar's vehicle and association with 7215 South 92nd East Avenue Apartment 2 Tulsa, Oklahoma and 3005 SW 60th Street Oklahoma City, Oklahoma*

57. During the course of this investigation, investigators have reviewed and monitored GPS location data for the gray 2018 Chevrolet Malibu, bearing Oklahoma tag NVE512 and the black Chevrolet Impala, bearing an Oklahoma temporary paper tag, both driven by Leticia Garcia-Salazar. Based on the GPS location data for the Malibu and Impala in conjunction with physical and electronic surveillance, investigators have observed that Leticia Garcia-Salazar resides at both 7215 South 92nd East Avenue Apartment 2, Tulsa, Oklahoma and **3005 SW 60th Street Oklahoma City, Oklahoma**.

58. During the course of this investigation, investigators have During the course of this investigation, investigators have conducted a Driver's License search for Leticia Garcia-Salazar, which revealed Garcia-Salazar to possess a valid Oklahoma driver's license with a listed address of **3005 SW 60th Street Oklahoma City, Oklahoma**.

26

59.   During this investigation, investigators have previously identified Garcia-Salazar to be a methamphetamine distributor, including distributing approximately 32 kilograms on March 12, 2024.

## Conclusion

60.   Based on the information above, I submit that there is probable cause to search **3005 SW 60th Street Oklahoma City, Oklahoma**, Western District of Oklahoma, including outbuildings and vehicles on the curtilage premises as further described in Attachment A, and seize the items described in Attachment B.

61.   I request to be allowed to share this affidavit and the information obtained from this search with any government agency, to include state and local agencies investigating or aiding in the investigation of this case or related matters, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions from this matter.

Respectfully submitted,

Task Force Officer Anthony Finnegan
Drug Enforcement Administration

Subscribed and sworn to by phone on April 22nd, 2024.

SHON T. ERWIN
UNITED STATES MAGISTRATE JUDGE

27

## ATTACHMENT A

## PREMISES TO BE SEARCHED

**3005 SW 60th Street Oklahoma City, Oklahoma**

The property to be searched is a residence located at 3005 SW 60th Street, Oklahoma City, Oklahoma, including outbuildings and vehicles on the curtilage premises. The property to be searched is a single-family dwelling, located in the 3000 block of SW 60th Street. The property to be searched is the eighth residential structure East of Drexel Avenue, located on the North side of SW 60th Street. The property to be searched is constructed of tan brick, tan siding, with tan trim and a gray roof. The front entry door is white, is located on the south side of the structure and faces south. The property to be searched is located in Oklahoma City, Oklahoma, Oklahoma County, Oklahoma and the Western District of Oklahoma. Below is a picture of the property to be searched.



**ATTACHMENT B**
**DESCRIPTION OF ITEMS TO BE SEIZED**

1.      Documents showing ownership of real or personal property;

2.      United States Currency or items reflecting drug proceeds;

3.      Books, records, receipts, notes and other papers relating to the trafficking of narcotics even though these documents may be in code or in a different language other than English or in electronically stored data.

4.      Contraband, including controlled substances, proceeds of drug sales, records of drug transactions, drug sources, drug customers, and other tangible items evidencing the obtaining, secreting, transfer and/or concealment of assets and/or money obtained through or used in the transportation, distribution, and sale of narcotics, including but not limited to drug or money ledgers, buyers lists, seller lists, recording of sales and any corresponding records of account receivable, money paid or received, drugs supplied or received, cash received to be paid for controlled substances or intended to be paid for controlled substances, whether in paper form or electronically stored data on computer discs, cellular telephones, or other storage media;

5.      Items of personal property tending to establish the existence of a narcotics conspiracy including but not limited to personal telephone bills, photographs and documents and other items reflecting names, addresses, telephone numbers, and communications;

6.      Paraphernalia for distributing, packaging and weighing narcotics.   Equipment and materials used in the building or using concealed compartments;

7.      Articles of personal property tending to establish the ownership of the property in

1

question, including telephone, rent receipts, keys, utility company receipts, papers, documents, letters and cancelled mail envelopes;

8.      Records of mail and communication services for cellular telephones and other communication devices which evidence the participation in a conspiracy to distribute narcotics;

9.      Records and items reflecting travel for the purpose of participation in drug trafficking including passports, airline tickets, vehicle rental receipts, credit card receipts, hotel and restaurant receipts, cancelled checks, maps and records of long distance calls reflecting domestic and foreign travel;

10.     Any and all appointment calendars;

11.     Bank statements, loan applications, money drafts, letters of credit, money orders, cashier's checks, bank checks, safety deposit box keys, vault keys, safes, any and all documents relating to banking activities and other financial transactions including the purchase of real estate and documents showing ownership of real estate;

12.     Records relating to employment, wages earned and paid and other compensation records.  Records relating to local, state and federal personal and business income, sales and service taxes, including but not limited to, computations, notes and records used for tax purposes;

13.     Evidence of proceeds including items relating to maintaining, secreting, gathering or liquidating drug proceeds, particularly:  financial records of withdrawals, funds of transfers, purchases, sales, transfers of assets or consolidation of assets.   Liquid assets or evidence of them including currency, bank statements, money drafts, letters of credit,

money orders, cashier's checks, pass books, precious metals and jewelry, and documents relating to safe deposit boxes, stocks, bonds and other financial instruments;

14.    Evidence of the expenditure of money for the purchase of vehicles or evidence establishing an ownership interest in vehicles, including certificates of title, vehicle tag records, photographs and receipts of vehicle transactions;

15.    Evidence (as listed above) contained within vehicles on the curtilage of the property to be searched;

16.    Cellular telephones, including electronically stored data on said telephones or other electronic storage devices such as PDA's or electronic organizers;

18.    Electronic memory chips or storage chips or SIM cards used in cellular telephones and the data and information stored thereon.   Computers and data storage devices including discs, drives, CD's and DVD's and the electronically stored data thereon.   The electronically kept information or data stored on electronic storage devices, computers or PDA's whether in files or disc, drives, in memory storage devices, in the drives or other electronic storage medium.   E-mail, text messages or other notes or records whether financial or otherwise, accessible by computer or other communication services stored in files on hard drives, drives, CD, DVD, in the drives, or other electronic storage medium or device;

19.    Firearms, ammunition and articles associated with the possession, ownership and use of firearms including, boxes, receipts, holsters, clips, and equipment.

20.    If any electronic storage device is seized during the search of the premises, a separate warrant will be sought before searching those storage devices for data.